IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 15–11–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| JOSEPH BRENT LOFTIS, | |
| Defendant. | |

Defendant Joseph Brent Loftis ("Defendant" or "Loftis") has renewed his Rule 29 Motion for a Judgment of Acquittal on Counts IV–VII (Doc. 210) and filed a Rule 33 Motion for a New Trial (Doc. 212). Defendant's motions follow the March 28, 2018 jury verdict convicting him of five counts of wire fraud in violation of 18 U.S.C. § 1343, and two counts of money laundering, in violation of 18 U.S.C. § 1957, as charged in the Third Superseding Information (Doc. 98). (Doc. 201 at 1–3.) For the following reasons, Defendant's Motions will be denied.

## DISCUSSION

## I.     Defendant's Rule 29 Motion for Judgment of Acquittal

In Defendant's Rule 29 Motion, he contends that a judgment of acquittal is required on Counts IV through VII of the Third Superseding Information because

–1–

the Government failed to present sufficient evidence to sustain a conviction on these counts.  (Doc. 211 at 1–2.)  Counts IV and V charged Defendant with wire fraud and Counts VI and VII charged Defendant with laundering the money gained by the fraud perpetrated in Counts IV and V.  (Doc. 98 at 5.)  Defendant's Motion was initially made at the close of the Government's case-in-chief, on March 26, 2018, at which point the Court reserved ruling on the Motion pursuant to Federal Rule of Criminal Procedure 29(b).  Defendant then renewed his Motion at the close of evidence on March 27, 2018, and the Court again reserved ruling on the Motion. On March 28, 2018, the case was submitted to the jury and Defendant was convicted of all counts.

There is sufficient evidence to support a conviction "if the evidence, viewed in the light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."  *United States v. Crawford*, 239 F.3d 1086, 1092 (9th Cir. 2001).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Because the Court reserved ruling on Defendant's Motion, "it must decide the motion on the basis of

the evidence at the time the ruling was reserved"—namely, at the close of the Government's case-in-chief.  Fed. R. Crim. P. 29(b).

## A. Wire fraud, Counts IV and V

To attain a conviction for wire fraud, the United States needed to prove beyond a reasonable doubt (1) a scheme to defraud, (2) use of the wires to further the fraudulent scheme, and (3) the specific intent to defraud.  18 U.S.C. § 1343; *United States v. French*, 748 F.3d 922, 935 (9th Cir. 2014).  Additionally, the materiality of the falsehoods employed in the scheme to defraud must be proven beyond a reasonable doubt.  *Neder v. United States*, 527 U.S. 1, 25 (1999).  A false statement is "material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 16 (internal quotation marks and citations omitted).

Defendant contends that the Government failed to produce evidence showing what statements or omissions by Defendant were received by the investors who funded the wire transfers made by escrow agent Gottbetter & Partners on August 9, 2011, and September 14, 2011.  Because the Government did not establish what information was communicated by Loftis to the investors, Defendant argues that there has been no proof of the materiality of any statements received.  (Doc. 211 at 8.)  Much of Defendant's argument revolves around his

contention that the Government needed to identify an individual investor to whom material representations were given.  To resolve this argument, the Court looks to the evidence presented by the Government to determine whether, when reviewed in the light most favorable to the United States, any rational trier of fact could have found materiality beyond a reasonable doubt.

### i.    Facts elicited at trial

The facts elicited at trial during the Government's case-in-chief established the following.  Beginning in 2009 through 2014, Defendant, doing business initially as Big Bear, then as Prism Corporation, and finally as Great Northern Energy, devised a scheme to defraud by misrepresenting his ownership of oil producing properties in Montana, Texas, and Oklahoma.  Defendant would enter into purchase agreements with the individuals who owned interests in oil and gas producing properties in these states to purchase their interests but would eventually default on the agreement.  Although Defendant knew that he did not own the interests he claimed to own in these properties, Defendant intentionally represented to investors that he did own the interests and would solicit funds from these individuals purportedly to help finance the costs of developing producing wells on the properties.  In order to induce these individuals to invest money with him, Defendant would falsely claim that existing wells on the properties were producing

large quantities of oil when the wells were actually producing very little in the way of marketable oil and gas. Defendant would also falsely claim that he had obtained degrees in petroleum engineering and geology and that his company employed the auditing services of an esteemed accounting firm to oversee the use of the investors' money. In at least two instances, investors learned that a "Joseph Brent Loftis" had been convicted of bank fraud and, when they asked him about this information, Defendant falsely claimed that he was not the same Joseph Brent Loftis who had been convicted. While investors were told that their money would be used for expenses incurred by production, once Defendant had been wired the funds, he used them largely for personal expenses. When the investors eventually inquired after their investments and sought returns, Defendant would claim low production or blame the lack of returns on unforeseen issues with drilling or disputes over ownership. When Defendant did promise to repay his victims, he would enter into rescission agreements but fail to deliver payments pursuant to the terms of these agreements and would eventually cease communication altogether.

As to the wire fraud convictions that Defendant challenges in his Rule 29 Motion—the charges stemming from the wires originating with Gottbetter & Partners— the United States presented the following evidence. Beginning late in 2010 through early 2011, Defendant began negotiations with John Schofield and

John Buthod, representatives of BuRay Energy, to purchase gas wells on BuRay's Talihina Prospect, located outside of LeFlore, Oklahoma. By February 11, 2011, Defendant had signed a purchase and sale agreement for the wells and leases comprising the Talihina Prospect which was initially set to close March 30, 2011, with Defendant making a $5 million cash payment up front and a future promise to pay an additional $25 million payable out of production. While the parties did not close the deal on March 30, 2011, a partial closing occurred on May 20, 2011, wherein BuRay delivered the Lease Assignment of the Talihina Prospect to Defendant. Then, on July 5, 2011, an escrow agreement was signed with Defendant agreeing to pay $4.61 million into escrow by 4:00 p.m. on July 13, 2011. The agreement provided that BuRay would deliver the documents necessary for Defendant to have the right to take over operations on the Talihina Prospect, the Assignment of Operating Rights and Bill of Sale, as soon as the funds were received—which would effectively make the Lease Assignment made on May 20, 2011, viable.

After Defendant failed to pay the funds on July 13, 2011, Defendant alerted BuRay that he would pay $1.45 million on July 25, 2011. However, Defendant again failed to make any payment. When BuRay informed Defendant that he was in default of their agreement and threatened to sue to enforce the agreement on

August 5, 2011, there were several unsuccessful attempts to enter into a forbearance agreement because Defendant continued to give BuRay assurances that he was able and willing to proceed with the deal. After BuRay repeatedly sought proof of funds and a signed forbearance agreement, Defendant sent a fax to BuRay on August 17, 2011, showing funds exceeding $1.2 million in Prism's Wells Fargo bank account, account number ending in 2037. The fax also contained a handwritten note signed by Defendant saying that he would "deposit $500,000 today and $1 million on Monday, August 23, 2011—these are [capital expenditure] funds from Prism equity agreements." Nonetheless, BuRay never received any payment from Defendant for the Talihina Prospect and never delivered the documents necessary for Defendant to begin operations on the property.

On a Friday in July of 2011, after Defendant had received the Lease Assignments for the Talihina Prospect on May 20, 2011, and while he continued to postpone depositing funds to close that deal with BuRay, he was introduced to Tydus Richards ("Richards"), who owned Lotus Asset Management, a company which secured money from third-party investors to fund oil and gas projects. Defendant told Richards that he was in closing with BuRay to purchase the Talihina Prospect and that he needed $2 million by Monday to close the deal.

Defendant falsely claimed that he was earning $300,000 a month, after expenses, from the numerous high-producing wells he claimed to already own in Montana. Defendant provided Richards with a PowerPoint "sales pitch" presentation. The sales pitch provided a disclaimer that all statements "other than statements of historical fact," were "forward looking." The sales pitch purported to show Prism's "debt free" financial position with "[o]ver $2 [billion] in quality reserves, assets, joint venture agreements & acreage positions" and proposed a strategy to frack the Hale and McCoy wells on the Talihina Prospect. Importantly, the sales pitch listed numerous Montana wells, which Prism did not in fact own, as being high-producing wells owned by Prism. Understanding that the $2 million dollar investment would be used to purchase and frack the Hale and McCoy wells, and that Prism owned high-producing wells in Montana, Richards introduced the sales pitch to a man named John Derby ("Derby"), who in turn introduced it to Adam Gottbetter ("Gottbetter"), of Gottbetter & Partners, and Mark Tompkins ("Tompkins") who found investors willing to fund the project by Monday provided Prism was willing to make a public offering. Richards communicated this to Defendant and got Defendant in contact with Gottbetter & Partners. Defendant agreed to make the requisite public offering.

Gottbetter & Partners then contacted Noah Levinson ("Levinson"), who owned the failed business Max Cash Media, which had taken the initial steps to become a public company. Gottbetter & Partners indicated that Defendant was seeking to take Prism public and that a reverse merger, wherein Prism would purchase and essentially subsume the already public company, Max Cash Media, allowing Prism to eventually make its own public offering while skipping the initial steps associated with going public, would be a beneficial arrangement for both Levinson and Defendant. Gottbetter & Partners also indicated that a bridge loan of $2 million was necessary to complete the reverse merger. Levinson agreed to the reverse merger arrangement and also agreed to make the $2 million bridge loan through Max Cash Media but funded by the investors found by Gottbetter & Partners, who would serve as the escrow agent for the bridge loan, with Prism's ostensible Montana wells and leases serving as collateral. Defendant signed the Bridge Loan Agreement and a Security Agreement on August 5, 2011—the same day BuRay threatened to enforce the agreement for the Talihina Prospect. The Security Agreement provided a security interest in all of Prism's assets in Montana and Oklahoma and warranted that Defendant had good and marketable title to all collateral. On that same day, Defendant's attorney, Chad Bassett ("Bassett"), emailed Gottbetter & Partners pressuring them to wire the funds by 1:00 p.m.

Gottbetter & Partners responded to Bassett's email by indicating that they had the funds in escrow and were ready to wire him $1 million but were waiting to receive certain documentation from Defendant. On August 9, 2011, Defendant signed a Bridge Loan Promissory Note, which was subject to the August 5, 2011 Bridge Loan Agreement, obligating him to repay $1 million no later than November 9, 2011. Importantly, the Bridge Loan Promissory Note was also secured by the August 5, 2011 Security Agreement which was believed to provide a security interest in Defendant's alleged ownership of Montana wells and leases. On August 9, 2011, after receipt of the signed Bridge Loan Promissory Note, Gottbetter & Partners wired $997,475.00 to Prism's Wells Fargo account number 2037. Thereafter, Defendant signed three more promissory notes, one for $500,000 on August 18, 2011, one for $250,000 on August 31, 2011, and another for $250,000 on September 9, 2011. Upon receipt of each of these promissory notes, Gottbetter & Partners wired the stated funds to Prism's Wells Fargo bank account, with the last wire occurring on September 14, 2011, for $208,024.10 (reflecting Prism's net deposit after the deduction of fees). It is worth noting that on August 17, 2011, Defendant faxed BuRay "proof of funds" of over $1.2 million and a promise to make a $500,000 deposit that same day and a $1 million deposit on August 23, 2011, both of which never happened.

After the funds had been transferred, Gottbetter & Partners attempted to complete the process for the reverse merger that was essential to Defendant's commitment to make a public offering, as promised by Defendant at the outset. However, Defendant failed to have the requisite audit of Prism completed and similarly failed to provide the documentation necessary to prove Prism's value and assets as required to complete the due diligence process. Despite repeated requests from Gottbetter & Partners for "the most important . . . documentation substantiating ownership of each asset included in the transaction," and discussion "of the fact that money had been forwarded that was . . . secured by these assets," Defendant failed to substantiate his purported well and lease ownerships which, by October 25, 2011, were represented by Defendant to include the Talihina Prospect. Eventually, Defendant defaulted and made promises to repay the $2 million bridge loan but never followed through.

It is worth noting that the Government also elicited facts regarding the following events. At one point, Richards found out that there had been a Joseph Brent Loftis in Oklahoma who "had done jail time for some oil and gas deal." Richards confronted Defendant with this information and Defendant denied that it was him, claiming that "'Loftis' is a common name in Oklahoma." At another point, Richards, Derby, Tompkins, Defendant, and others met in Texas to celebrate

Defendant's report that frackking on the Talihina Prospect had exceeded expectations. Since Derby and Tompkins had arranged the funding, they had come in to "see the . . . progress of the asset." Lastly, when it was discovered that Defendant had not even retained auditing services to complete the reverse merger, Richards talked with Bassett about the prospect of Prism paying back the bridge loan with "the cash flow." Bassett, Defendant's attorney, apparently surprised, responded "Really? There's cash flow? . . . "That's not cash flow. That's . . . bringing in new investors' money."

Counts IV and V charged Defendant with executing his scheme to defraud by causing the wire transmission of $997,475.00 from Gottbetter & Partners on August 9, 2011, and $208,024.10 from Gottbetter & Partners on September 14, 2011, respectively. (Doc. 98 at 4.)

## ii. Legal analysis

Initially, Defendant asserts that the Government failed to produce evidence of an identifiable investor. Nonetheless, Defendant "does not contest the Government's argument that 'the Ninth Circuit has acknowledged that the government does not need to prove a victim's identity beyond a reasonable doubt.'" (Doc. 226 at 4–5 (quoting Doc. 224 at 12).) Instead Defendant argues that the Government needed to specifically identify the investors providing the

funds to Gottbetter & Partners to sustain a conviction for Counts IV and V. Because the Government did not prove the identities of the individual investors, Defendant asserts that the Government failed to prove that a material false statement or omission was received by them. The Court begins by addressing the argument as to what form of victim identification suffices under Ninth Circuit law which, in turn, requires analysis of the seeming disparity between two Ninth Circuit cases: *United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001), and *United States v. Milwitt*, 475 F.3d 1150 (9th Cir. 2007).

In *Crawford*, Crawford was convicted of wire fraud after using interstate faxes to sell a valuable painting which she had taken from her office at UCLA. Crawford appealed her conviction on the grounds that the Government had not proved that UCLA owned the painting. The Ninth Circuit held that:

> The government did not need to prove beyond a reasonable doubt that UCLA owned [the painting], only that Crawford knew that she did not. The days of homesteading are over, and the jury may presume that property has a rightful owner, even if the identity of the rightful owner is not immediately known to one who comes upon the property.

*Id.* at 1092–93. Further, in justifying its position over that of the dissent, the Court noted that "[i]n this case, the dispute is not about the type of property right, but rather whether the possessor of the property right must be identifiable. That we have never held to be an element of the offense of wire fraud." *Id.* at 1092 n. 6.

In *Milwitt*, Milwitt was convicted of five counts of bankruptcy fraud and appealed his conviction based upon the alleged insufficiency of the evidence. The indictment charged Milwitt with filing sham bankruptcy petitions on behalf of tenants which "fraudulently obstructed the creditors' legal right to collect back rents, and repossess the properties." *Id.* at 1154. At trial, however, the Government elicited testimony solely regarding the fraud Milwitt perpetrated on the tenants, not the fraud charged in the indictment against the creditor/landlords. The district court instructed the jury according to the indictment, "describing the third element of bankruptcy fraud as requiring the jury to find that the defendant acted with the intent to defraud a creditor." *Id.* at 1158 (internal quotation marks omitted). During closing argument, the Government "focused . . . on demonstrating that the landlords were the indirect victims of the overall scheme to defraud, while the tenants were the primary mechanisms of the fraud." *Id.* (internal quotation marks omitted).

The Ninth Circuit held that the "specific intent to deceive or defraud element of the mail and wire fraud crimes requires the prosecution to prove that the defendant intended to defraud an identifiable individual." *Id.* at 1156. Because the indictment had charged Milwitt with perpetrating a scheme to defraud the landlord/creditors but the proof at trial had shown only that the fraudulent scheme

was one by which Milwitt defrauded the tenants, there was no evidence to support the allegations of the indictment and reversal was warranted. Therefore, there was insufficient evidence to convict because "the government [had] attempted to prove an entirely different case under an entirely different theory" than that contained in the indictment.

The Ninth Circuit distinguished its holding in *Milwitt* from its holding in *Crawford* on the basis that the fraudulent scheme in *Crawford* "was identified and proven, and the government established that Crawford knew that she had no ownership interest." *Milwitt*, 475 F.3d at 1159 n. 6. *Crawford*, therefore, was "in stark contrast with [*Milwitt*, where] the indictment was based on an entirely different fraudulent scheme and victims." *Id.* This Court agrees with the United States District Court for the Northern District of California that these cases are reconcilable in the following way:

> *Crawford* merely established that the prosecution need not prove beyond a reasonable doubt the *identity* of the victim. *Milwitt*, on the other hand, requires that there be a victim, not that the government prove the identity of the victim beyond a reasonable doubt. There are cases, for example, in which the victim is dead or gone and the identity unknown but it is certain that he or she was victimized.

*United States v. Green*, No. CR 05-00208 WHA, 2007 WL 9706398, at *2 (N.D. Cal. June 28, 2007) (emphasis in original).

Here, the Court does not find the fact that the private investors assembled by

Gottbetter & Partners were never individually identified to be determinative

because there was an identified victim.  The Third Superseding Information

charged Defendant with perpetrating his scheme to defraud on "investors and

businesses."  (Doc. 98 at 3.)  The Court finds "investors and businesses" to be

adequately identified victims in light of the Ninth Circuit's directives in *Milwitt*

and *Crawford*—that there be a victim of the proven scheme but that the

Government does not have to prove the identity of the victim beyond a reasonable

doubt.  Moreover, there is a specific victim identified in this case: Gottbetter &

Partners, the business responsible for finding the investors and serving as the

investors' broker for the bridge loan arrangement.  In this vein, the Court instructed

the jury that the third element of wire fraud on Counts IV and V required a finding

that "the defendant acted with the intent to defraud Gottbetter & Partners, LLP,

that is, the intent to deceive or cheat."  (Doc. 198 at 22–25.)

The Court now turns to Defendant's argument that the Government needed

to produce evidence of what false statements or omissions were received by the

individual investors assembled by Gottbetter & Partners to prove the element of

materiality.  Defendant's argument fails to acknowledge the fact that the

statements Defendant made on one Friday in July of 2011 were sufficient to

persuade Richards, Derby, Gottbetter, and Tompkins to assemble $2 million within three days.  The Court finds that the Government's evidence regarding the statements made by Defendant to Richards were sufficient to allow a reasonable juror to find the element of materiality beyond a reasonable doubt.

The materiality of Defendant's false statements are evaluated "under an objective test," which determines whether the false statement "has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Lindsey*, 850 F.3d 1009, 1013–14 (9th Cir. 2017) (internal quotation marks and citation omitted).  The inessential nature of the identity of the victim himself is evinced by the fact that "[t]his standard is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself." *Id.* at 1015 (internal quotation marks and citation omitted).  "A misrepresentation may be material without inducing any actual reliance.  What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose." *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981).  Here, neither the scheme to defraud nor the intent of Defendant is at issue, the only dispute is to the materiality of Defendant's statements.  (Doc. 226 at 4.)  Consequently, the Court looks at what the Government proved were the false

statements which were made by the Defendant with the intent to induce a $2 million investment in his company.

As detailed above, the false statements made by the Defendant to Richards to persuade him to find people willing to invest in Prism were: 1) that Defendant owned leases and wells in Montana; 2) that these leases and wells were high producing; 3) that Defendant intended to use invested funds to purchase the Talihina Prospect and begin frackking the Hale and McCoy Wells; and 4) that Defendant was earning $300,000 a month after expenses.  Arming Richards with this false information and a PowerPoint sales pitch including the false statements about Prism's assets, value, and plans regarding the Talihina Prospect, Defendant requested that Richards secure $2 million within three days.[1]  Richards then passed Defendant's false claims on to Derby, and asked him to "take a look at it."  The Court is satisfied that the "it" in this instance is the one thing that Richards said was given to him at his meeting with Defendant, his PowerPoint sales pitch.  Derby, Gottbetter, and Tompkins apparently did "take a look at it."  In fact, they were convinced enough by the sales pitch to actually assemble $2 million in private investments.

---

[1] The Court will not entertain Defendant's untenable argument that a sales pitch "does not have the natural tendency to convince a party to part with money or property."  (Doc. 226 at 15.)  Merely stating something does not make it so.

Defendant contends that while we know what Defendant represented to Richards and from Richards, in turn, to Derby, we do not know whether these representations were passed on to the individual investors because the Government did not call a witness who knew precisely who the investors were. Defendant's argument is unsupportable in light of the above. Looking at the statements made by Defendant, it becomes apparent that the only statements that "had a natural tendency to influence, or were capable of influencing, a person to part with money or property," when viewed objectively, were Defendant's false statements. As proven by the sales pitch and the testimony of Richards, Levinson, and Barrett DiPaolo ("DiPaolo") and Vernon Archibald ("Archibald"), both of Gottbetter & Partners, the money was secured to allow Defendant to purchase the Talihina Prospect. However, as proven by the testimony of John Schofield and John Buthod, Defendant's representation that he was working on closing the deal for the Talihina Prospect was false. On the same day that Defendant signed the Bridge Loan Agreement and Security Agreement, August 5, 2011, Defendant was attempting to dissuade BuRay from enforcing the purchase agreement for the Talihina Prospect by feigning continued interest and discussing the signing of a forbearance agreement. Next, as proven by Levinson, DiPaolo, and Archibald, the loan was going to be secured by Defendant's purportedly substantial assets which

were represented to include valuable wells and leases in Montana. However, as proven repeatedly throughout the trial, Defendant did not own the wells and leases. The Court cannot think of two more material or essential facts necessary to induce a stranger to loan $2 million than 1) what the loan would be used for, and 2) what property would secure the loan. However, Defendant sweetened the pot. Defendant further represented to Richards that he was earning $300,000 a month after expenses and, as represented in the sales pitch, Prism was "debt free" with assets that included high producing wells. The Court is convinced that these statements, when viewed objectively, were not only capable of influencing a person to part with money, they were intended and designed to do so.

The materiality of Defendant's false representations concerning both his intent to use the money to purchase the Talihina Prospect and his ownership of wells and leases in Montana is further evidenced by the fact that Defendant was required to sign a Security Agreement providing Max Cash Media with a security interest in Defendant's "now owned or existing or hereafter acquired" collateral in both Montana and Oklahoma. As proven by the testimony of Levinson, DiPaolo, and Archibald, the collateral was understood to be Defendant's Montana wells and leases and, once the funds were disbursed, to thereafter include the Talihina Prospect in Oklahoma. Taking all of this evidence into consideration in a light

most favorable to the Government, the Court is convinced that the United States did present sufficient evidence to allow a reasonable juror to find, beyond a reasonable doubt, that material misrepresentations were delivered to Gottbetter & Partners and the unidentified investors.

### B. Money Laundering, Counts VI and VII

The jury was instructed that to attain a conviction for money laundering, the United States needed to prove:

> First, the defendant knowingly engaged or attempted to engage in a monetary transaction; Second, the defendant knew the transaction involved criminally derived property; Third, the property had a value greater than $10,000; Fourth, the property was, in fact, derived from wire fraud arising out of Count IV of the Third Superseding Information which involves Gottbetter & Partners, LLP; and Fifth, the transaction occurred in the United States.

(Doc. 198 at 26–29.) Pursuant to the Ninth Circuit Model Jury Instructions, the jury was also instructed that the term "criminally derived property" means "any property constituting, or derived from, the proceeds of a criminal offense." (*Id.* at 26–29.) Further, the jury was instructed that the government "must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense." (*Id.* at 26–29.)

Defendant contends that if "the Court finds insufficient evidence to sustain a conviction for Count IV of the Information, it must also dismiss Counts VI–VII for

the same." (Doc. 226 at 16.) Counts VI and VII of the Third Superseding

Information allege that Defendant committed money laundering on August 19,

2011, in the amount of $190,000 and on August 20, 2011, in the amount of

$29,750 via wire transfer and check, respectively. (Doc. 98 at 5.) Relying entirely

upon his argument concerning the insufficiency of the evidence for the wire fraud

counts addressed above, Defendant asserts that the Court must acquit him of

Counts VI and VII because these counts arose "from proceeds obtained from

Gottbetter & Partners bridge loan [and] the Government provided insufficient

evidence to prove the bridge loan was a 'criminal offense'" for purposes of

establishing the crime of money laundering. (Doc. 211 at 14.)

Because the Court finds that the Government did elicit sufficient evidence to

sustain the wire fraud conviction for Count IV and Defendant has not provided any

alternative basis for a finding of insufficient evidence on the money laundering

charges, the Court further finds that the Government produced sufficient evidence

to allow a reasonable juror to find the essential elements of money laundering. The

Government elicited sufficient evidence at trial showing that Defendant laundered

the money gained by the wire fraud committed on August 9, 2011, by purchasing a

$190,000 Prevost RV on August 19, 2011, and a $29,750 GMC Denali on August

22, 2011, with funds from Prism's Wells Fargo bank account ending in 2037.

Consequently, Defendant's Rule 29 Motion is denied.

## II.    Defendant's Rule 33 Motion for new trial

In Defendant's Rule 33 Motion, he contends that a new trial is necessary in his case for four reasons.  First, the jury was improperly allowed to consider the Gottbetter & Partners Counts in conjunction with Counts I through III when the Court failed to grant Defendant's Rule 29 Motion before the case was submitted to the jury.  Second, Defendant rehashes his prior argument against allowing the "uncharged witnesses" to testify during his trial, contending that the evidence presented through these witnesses violated Federal Rule of Evidence 403.  Third, Defendant argues that allowing evidence of his prior bank fraud conviction to be admitted violated this Court's Order regarding this evidence and resulted in unfair prejudice.  Lastly, Defendant contends that the Government was allowed to call an impermissible rebuttal witness regarding his membership in the Society of Petroleum Engineers.  (Doc. 213 at 4–16.)

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Ninth Circuit has established the following

regarding the standard this Court is to implement in reviewing Defendant's

Motion:

> A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992). To reiterate, the

Court's discretion to grant a new trial should only be exercised "in exceptional

cases in which the evidence preponderates heavily against the verdict." *United*

*States v. Showalter*, 569 F.3d 1150, 1157 (9th Cir. 2009) (quoting *United States v.*

*Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)).

**A. The denial of Defendant's Rule 29 Motion**

As discussed above, the Court is denying Defendant's Rule 29 Motion in its

entirety. Consequently, the Court does not find any prejudice resulting from the

Court's prior decision to reserve ruling on Defendant's Rule 29 Motion during trial

and allowing the jury to consider all of the alleged counts contemporaneously. As

a result, the interests of justice do not require a new trial on this basis.

### B. The "uncharged witnesses"

On January 29, 2018, Defendant filed a Motion in Limine to exclude
specific Government witnesses and evidence pursuant to Federal Rule of Evidence
403. Defendant made this request on the basis that allowing a number of
"uncharged witnesses" to testify relating to transactions occurring in Texas,
Oklahoma, and Louisiana would unfairly prejudice the Defendant, be confusing or
misleading to the jury, be a waste of time, cumulative, and cause undue delay, all
in favor of exclusion under Rule 403. As the Parties are well aware, the Court is
operating in the wake of the interlocutory appeal and decision of the Ninth Circuit
in this case. In its opinion, the Ninth Circuit directed this Court that evidence of
uncharged transactions was not to be excluded under Rule 404(b) because the
evidence would not be evidence of "other" crimes but constituted evidence "of part
of the crime charged in the indictment—the overall scheme to defraud." *United
States v. Loftis*, 843 F.3d 1173, 1175 (9th Cir. 2016). The Ninth Circuit left open
the question of whether the testimony of "uncharged witnesses" would violate Rule
403. That issue, as stated above, was the basis for Defendant's Motion in Limine.
The Government argued that the witnesses challenged by Defendant would all
present highly probative evidence of the scheme to defraud which outweighed the

factors for exclusion under Rule 403. On March 6, 2018, the Court reserved ruling on Defendant's Motion until trial.

On March 20, 2018, the second day of trial, the Court ruled on Defendant's Motion. The Court broke the "uncharged witnesses" into four separate groups based upon the transactions they were anticipated to testify about. First was the BuRay transaction, which required the testimony of John Schofield and John Buthod. Great Northern Energy comprised the second transaction and was anticipated to require the testimony of Ray Baker and Sameer Dalal. Third was the Circle Ridge Production transaction requiring the testimony of Bill Briscoe and Kevin Stephens. Last was the McGuffin Group which consisted of witnesses Lucy and Joe McGuffin. After considering both the time frames in which each of the transactions occurred and the locations involved, the Court analyzed the impact of the groups under Rule 403. Of importance to the Court was the potential for unfair prejudice to the Defendant resulting from the cumulative effect of having so many witnesses testify as to Defendant's conduct and the potential for the jury to be misled or confused by the sheer amount of proposed testimony. Taking into consideration all of the factors under Rule 403, as well as the directive of the Ninth Circuit regarding uncharged conduct, the Court excluded evidence regarding both the Circle Ridge Production transaction and the McGuffin Group. The Court

allowed evidence regarding the BuRay transaction and the Great Northern Energy group because both coincided temporally with the charged conduct—BuRay occurring at the same time and Great Northern occurring immediately after the Gottbetter & Partners transaction.

In his current Motion, Defendant first asserts that the Government violated the Court's March 6, 2018 Order reserving ruling on Defendant's Motion in Limine by discussing the "BuRay Deal" and naming both John Schofield and John Buthod as expected witnesses during the Government's opening statement on March 19, 2018. Defendant contends that this "rang a bell that could not be unrung for the duration of the trial" and, in effect, forced the Court's decision to allow evidence of the BuRay deal when the Court ruled on Defendant's Motion in Limine on March 20, 2018. (Doc. 213 at 8.) The Court does not agree that the Government's admitted error hamstrung the exercise of the Court's discretion. Further, with the benefit of hindsight, the Court is thoroughly convinced that the BuRay transaction constituted charged conduct as the deceit inflicted upon BuRay was an essential part of Defendant's scheme to defraud Gottbetter & Partners, serving as the purported objective for requesting a $2 million loan.

Next, Defendant contends that the Court's decision to allow the testimony of Anita Blakely ("Blakely") was "the perfect microcosm of the injustice" Defendant

experienced during his trial.  To back up this contention, Defendant states that

Blakely "was not part of the Order identifying acceptable 'uncharged witnesses.'"

(Doc. 213 at 9.)  Defendant's argument apparently being that Blakely was not

identified as a witness for either the BuRay or Great Northern Energy transactions

and so must have fallen into the lot of excluded witnesses per the Court's March

20, 2018 Order.  Further, Defendant contends that "the testimony of a part-time

accountant working for Great Northern Energy for six (6) weeks, years after the

[transactions identified in Counts I through III] . . . served no other purpose than to

confuse the issues for the jury and unfairly prejudice Loftis."  (*Id.*)

The Court is not convinced by Defendant's argument.  Again, the Court

carefully weighed the balancing factors under Rule 403 and concluded that

allowing evidence of both the BuRay and Great Northern Energy transactions were

more probative than prejudicial.  Both transactions were sufficiently close

temporally to provide probative evidence pertaining to Defendant's scheme to

defraud as executed in Counts I through V of the Third Superseding Information.

The Court stands by its prior decision.  Further, Blakely actually worked at Great

Northern Energy and provided valuable testimony regarding the business practices

of Great Northern Energy so any argument that she should not have been included

as a witness to testify regarding the Great Northern Energy transaction is without merit.

In sum, the Court is not convinced that any *post-hoc* argument presented by Defendant in this Motion warrants a different conclusion than was reached on March 20, 2018, when this Court decided Defendant's Motion in Limine. The Rule 403 analysis previously performed remains the same. Further, Defendant's argument fails to establish that the evidence was insufficient to support the conviction or that the evidence weighs heavily against the verdict. Consequently, a new trial is not warranted.

### C. Defendant's prior bank fraud conviction

The Defendant next argues that the admission of evidence showing his prior conviction for bank fraud was unfairly prejudicial. The Court reserved ruling on Defendant's earlier Motion in Limine to exclude all evidence of his criminal record. Nonetheless, the Court ordered:

> If a witness testifies that Loftis was asked, or he volunteered, that he had no criminal record, then evidence of only a prior conviction is admissible. However, if a witness testifies that the witness asked Loftis specifically about a fraud conviction, and he denied it, then evidence of the nature of the prior conviction will become admissible at that time.

(Doc. 162 at 5.)  At trial, Sameer Dalal ("Dalal") testified that he confronted Defendant with evidence showing that a "Joseph Brent Loftis" had been convicted of bank fraud and that Defendant denied it was him.  After Dalal's testimony on this point, the Court allowed the Government to introduce the record of Defendant's prior bank fraud conviction.  Additionally, during Richards' testimony, there was mention of the fact that Richards had learned that a "Joseph Brent Loftis" had "done jail time for some oil and gas deal" but that Defendant denied it was him when confronted by Richards.  Other than Richards' vague reference to an "oil and gas deal," there was no discussion of the specifics of Defendant's crime during Richards' testimony.[2]

Defendant now argues that the admission of this evidence as a result of the testimony of Dalal was unfairly prejudicial because the Government did not prove that it was part of Defendant's scheme to defraud.  Defendant makes this assertion primarily on two grounds. First, Dalal was part of the uncharged conduct and did not personally have knowledge of Defendant's other schemes. Second, the

---

[2] It is worth noting that there was also evidence of Defendant's fraud conviction at an earlier point in this trial, when Defendant's counsel, Michael Sherwood, unsuccessfully attempted to admit "only a few pages" of Defendant's due diligence questionnaire which, after being admitted in its entirety under the rule of completeness, was shown to include Defendant's admission to having "been convicted of fraud in a civil or criminal proceeding."

conversation in which Dalal specifically asked about Defendant's bank fraud conviction occurred after he had already invested money with Defendant.

Dalal testified in regards to the Great Northern Energy transaction. This transaction, as previously discussed, is considered by the Ninth Circuit and this Court to be an uncharged transaction which provided evidence of the scheme to defraud charged in this case. Further, as previously discussed, this transaction survived the Rule 403 balancing analysis. Consequently, the Court is satisfied that the evidence presented regarding the Great Northern Energy transaction, including the testimony of Dalal, could permissibly be considered by the jury to piece together the different manners and means by which Defendant executed the overall scheme to defraud as charged. Thus, the Court does not find it to be important that Dalal was not related to the other counts, or that Dalal did not have knowledge of the other counts, or that Dalal was uncharged. It is enough that Dalal testified to Defendant's scheme with respect to himself because it was part of Defendant's overall scheme to defraud as charged in the Third Superseding Information. *Loftis*, 843 F.3d at 1177–78.

Defendant next asserts that because Dalal did not confront Defendant with the evidence of his prior conviction until after he had already given Defendant money, it cannot be evidence of the scheme employed to induce victims to part

with money.  However, as pointed out by the Government, "Courts have long recognized that a defendant may continue to commit acts in furtherance of a scheme . . . both before and after money or property is obtained from a victim." (Doc. 224 at 18.)  Indeed, it is apparent that Defendant's denial of his criminal history to both Dalal and Richards was "designed to lull [his] victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of [Defendant] less likely."  *United States v. Manarite*, 44 F.3d 1407, 1412 (9th Cir. 1995).  Even though Richards did not personally invest any money with Defendant, the Court is satisfied that this same lulling objective motivated Defendant to deny his criminal history to Richards.  Richards continued as a middle-man between Defendant and Gottbetter & Partners, primarily serving in this capacity when problems arose.  Therefore, Defendant had incentive to dissuade Richards from believing he had previously been convicted of fraud involving oil and gas as Richards could have stressed this information to Gottbetter & Partners and destroyed whatever sense of security existed between them at that point.

The Court is satisfied that the evidence of Defendant's prior bank fraud conviction was not unfairly prejudicial, much less evidence which would convince this Court that "it would be a miscarriage of justice to let the verdict stand."

*United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991) (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985).

### D. The Government's rebuttal evidence

Lastly, Defendant takes issue with the Court's decision to allow the Government to introduce the testimony of a custodian of records from the Society of Petroleum Engineers as rebuttal evidence. Defendant contends that this was not actually rebuttal evidence because Defendant "offered no evidence of Loftis's affiliation with the Society of Petroleum Engineers during its case-in-chief." (Doc. 213 at 13.) The United States counters that Defendant introduced the testimony regarding the Society of Petroleum Engineers during his cross-examination of Schofield and Dalal, apparently pursuing a theory that he had the knowledge and credentials to produce oil and gas for investors as evidenced by his purported membership in the Society of Petroleum Engineers. To rebut this evidence, the Government "presented evidence that any justification [Defendant] used to support his status through membership in the Society of Petroleum Engineers was in fact false." (Doc. 224 at 19–21.) Indeed, the custodian testified that Loftis sought admission into the Society of Petroleum Engineers on the basis that he had

received a high diploma from the University of Oklahoma in petroleum and

engineering geology.[3]

The Court allowed the custodian to testify during rebuttal even though the

testimony was not pure rebuttal in the sense that it didn't come up during the

Defendant's case-in-chief because it was an issue that had come up numerous

times throughout the case and the Court wanted to ameliorate any confusion

regarding the qualification to become a member in the Society of Petroleum

Engineers.  As stated in *United States v. Koon*, 34 F.3d 1416, 1429 (9th Cir. 1994),

*reversed in part on other grounds*, 518 U.S. 81 (1996),

> District courts have broad discretion in deciding the order in which
> evidence may be presented at trial.  *See* Fed. R. Evid. 611(a) (trial
> courts "shall exercise reasonable control over the mode and order of
> interrogating witnesses and presenting evidence").  Indeed, the
> Advisory Committee Notes to Rule 611(a) reveal that the rule was
> intended to avoid imposing on the district courts strict rules
> concerning the order in which evidence should be presented.
> Moreover, several courts have held that district courts have wide
> discretion to allow the government to introduce as part of its rebuttal
> case evidence which might have been presented in the government's
> case-in-chief.  *E.g.*, *United States v. Tejada*, 956 F.2d 1256, 1267 (2d
> Cir. 1992), *cert. denied*, 506 U.S. 841 (1992); *United States v.
> Braxton*, 877 F.2d 556, 561 (7th Cir. 1989).

In this light, the Court is satisfied that its decision to allow the Government to put

on evidence rebutting implications raised during Defendant's cross-examination of

---

[3] Defendant's false claims of receiving any degrees were debunked during the United States'
case-in-chief.

Government witnesses was within its discretion. Further, the Court remains convinced that the testimony was beneficial to the jury in terms of resolving the issue of who is qualified to claim membership in the Society of Petroleum Engineers. Again, Defendant falls short of showing the need for a new trial in this matter.

Before concluding, the Court addresses Defendant's cursory argument that the cumulative effect of all of these alleged errors prejudiced the jury to such an extent that they convicted Defendant on insufficient evidence regarding Counts I through III. (Doc. 213 at 15.) To the extent that this insufficiently presented assertion requires an answer, the Court is convinced that there was more than sufficient evidence to allow a reasonable juror to find all elements of these counts beyond a reasonable doubt. Moreover, Defendant has wholly failed to prove that his is the "exceptional case[] in which the evidence preponderates heavily against the verdict" so as to merit a new trial. Accordingly,

IT IS ORDERED that Defendant's Rule 29 Motion (Doc. 210) and Rule 33 Motion (Doc. 212) are DENIED.

DATED this 27th day of June, 2018.

Dana L. Christensen, Chief District Judge
United States District Court